**IN THE UNITED STATES DISTRICT COURT**
**FOR NEW HAMPSHIRE**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID 100004922881994 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC.** | Case No. __18-mj-232-01-AJ__<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

I, Shayne Tongbua, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID 100004922881994 (the SUBJECT ACCOUNT).

2. Based on the facts set forth in this affidavit, I believe that the SUBJECT ACCOUNT was used in furtherance of violations of Title 18 U.S.C. § 922(g)(1) – Felon in Possession of a Firearm, and Title 21 U.S.C. § 841 – Possession with Intent to Distribute a Controlled Substance, and that there is probable cause to believe that the information regarding the SUBJECT ACCOUNT will lead to evidence, fruits, and instrumentalities of these crimes as well as to the identification of individuals engaged in the commission of these and related

1

crimes. A preservation request for the SUBJECT ACCOUNT was previously submitted to Facebook on July 24, 2018.

3. I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been employed with the FBI since 2009. In the course of my duties, I have investigated national security matters relating to economic espionage and terrorism, as well as federal criminal violations concerning explosive materials, human-trafficking, crimes against children, organized crime, narcotics, and other criminal violations. I have acquired experience in investigating various violations of federal law through extensive training at the FBI Academy in Quantico, Virginia, and by conducting investigations in the field. During my career, I have participated in many criminal investigations as a case agent and/or in a subsidiary role and have participated in the execution of numerous federal search warrants. I am a federal law enforcement officer of the United States within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), duly authorized to conduct investigations of and make arrests for violations of United States Code.

4. The facts in this affidavit come from my personal observations, training, and experience as well as information obtained from other law enforcement officials and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 922(g)(1) and 21 U.S.C. § 841 have been committed by Nathaniel CARR and his associates. There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

**PROBABLE CAUSE**

*Background*

6. CARR has a criminal history that includes convictions for simple assault, credit card fraud, criminal mischief, criminal threatening, loitering, receiving stolen property, resisting arrest, theft, trespassing, and violations of probation, along with revoked driving privileges for being a habitual offender. The SUBJECT ACCOUNT is registered to CARR and has been observed to display evidence of illicit activities. In addition, CARR conveyed to law enforcement that he routinely communicates with and coordinates activities concerning methamphetamine customers via Facebook Messenger.

7. Quinn POLLOCK is the known girlfriend of CARR. A review of POLLOCK's criminal history shows multiple charges for drug possession and transportation of drugs in a motor vehicle as well as charges for speeding and criminal mischief. POLLOCK also maintains a Facebook account which has been observed to display evidence of illicit activities.

*Investigation*

8. On July 30, 2018, POLLOCK was arrested by Concord, NH Police Department (PD) for previously issued arrest warrants for drug possession and failure to appear in court. She received an additional charge of possession of controlled drugs after admitting to the arresting officers that she had a bag containing methamphetamine concealed in her bra.

9. On August 1, 2018, a Concord PD officer observed a man who he believed to be CARR get in the driver's seat of a Chevy Trailblazer in the parking lot of 7-Eleven in Concord, NH. Officers also observed a female passenger entering the vehicle. The Trailblazer had an expired New Hampshire temporary license plate and a loud exhaust. Officers observed the

vehicle leave the parking lot and saw it again as it turned into the Morning Star Apartment complex in Concord.

10. When officers located the vehicle in the rear parking lot of the apartment complex, officers activated their emergency lights. The male exited the driver's side of the vehicle and the female exited the passenger side. In response to questions from an officer, the male said that he did not have his license and said that his name was "Kyle Kniffen." He also stated that he had not been driving. The female initially refused to identify herself and stated that she had not been in the car.

11. At one point during the interaction, the male went back to the car, claiming to look for his wallet. As he did, an officer observed a handgun in the pocket of the open driver's door. Officers also observed a box of .22 ammunition on the passenger side floor and the vehicle's keys in the center console.

12. Ultimately, officers determined that the male was CARR, not "Kyle Kniffen." CARR has previously been convicted of several felonies, including a 2017 drug felony in Belknap County, and a 2016 assault by a prisoner felony in Merrimack Superior Court. CARR has not been pardoned for these offenses and has not had his rights restored. As a result, he is legally prohibited from possessing firearms.

13. A New Hampshire license check also revealed that CARR was under suspension after a Habitual Offender Certification Hearing on September 27, 2017, where his license was revoked.

14. The female was ultimately identified as Deatrah REILLY. After initially being detained, REILLY was released when officers confirmed that she had no active warrants for her person.

15. Officers obtained a warrant to search the vehicle and seized the following items:

   a. a .22 caliber Heritage Arms, Model Rough Rider revolver, bearing serial number W01733, loaded with 6 rounds of .22 ammunition;

   b. suspected marijuana;

   c. a glass marijuana pipe; and

   d. a box of .22 ammunition.

16. Following his arrest, CARR was read his Miranda rights and signed an Advice of Rights form agreeing to answer questions without a lawyer present. In the interview, CARR stated that he is a drug user and dealer. CARR stated that he primarily used and sold methamphetamine, but had also used and sold Fentanyl/Heroin in the past. CARR stated that he lived with POLLOCK and that they would purchase, sell, and use drugs together. CARR stated that he communicated with his customers and sources of supply with Facebook Messenger. CARR advised that he lived at 3 Royal Gardens, ▓ in Concord, NH. CARR further stated that his roommate had overdosed on drugs multiple times at the apartment.

17. CARR signed up as a confidential informant and was released at the conclusion of the August 1, 2018 interview, but did not provide any meaningful cooperation afterwards.

18. On August 24, 2018, CARR was arrested for multiple outstanding warrants concerning driving as a habitual offender, possession of a dangerous weapon as a felon, possession of marijuana, and receiving stolen property. Law enforcement also executed a search warrant at CARR's residence, 3 Royal Gardens, ▓ in Concord, NH., and seized numerous items, including:

    a. a camouflage backpack containing an Star, Model S, .380 Caliber Pistol, bearing serial number 1897463, with 9 rounds of ammunition, including 1 round in the chamber and 8 in the magazine;

    b. additional miscellaneous ammunition;

    c. a black and silver case containing suspected methamphetamine, suspected fentanyl, and drug paraphernalia; and

    d. multiple ledger notebooks detailing drug trafficking activities which appears to be authored by POLLOCK.

19. The suspected methamphetamine and fentanyl were sent to the Drug Enforcement Administration laboratory for testing. Official laboratory results are pending.

20. On October 3, 2018, CARR was indicted by grand jury in the U.S. District Court for the District of New Hampshire on two counts of Felon in Possession of a Firearm.

### *Facebook Activity*

21. As discussed earlier, on August 1, 2018, CARR stated that he used Facebook Messenger to communicate with his drug customers and sources of supply.

22. On August 17, 2018, CARR posted a video on Facebook that was sent to many of his Facebook "friends." In the video CARR shoots a shotgun. A female voice believed to be POLLOCK can also be heard in the background.

23. On August 24, 2018, POLLOCK posted a series of photographs of herself and CARR. The photographs appear on the profiles belonging to both individuals, including the SUBJECT ACCOUNT. In the photos, the two appear to be seated in the rear seat of a vehicle.

Also, CARR is seen:

- wearing black, wireless headphones which appear to be identical to ones found in a small safe also containing firearms ammunition, discovered during execution of the search warrant that day;

- with a black and silver case on his lap which appears to be identical to one discovered during execution of the search warrant that day and found to contain suspected methamphetamine, suspected fentanyl, and other drug paraphernalia; and

- holding a red, metallic smoking apparatus which appears to be identical to one found in a backpack discovered during execution of the search warrant that day; the backpack also contained an INTERARMS 380 pistol, bearing serial number 1897463.

## **FACEBOOK**

24.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

25.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

26.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

27.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

28.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user

and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

29. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

30. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

31. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

32. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as

9

webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

33. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

34. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

35. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

36. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

37. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

38. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

39. Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

40. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

41. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

42. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date),

the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

43. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of

Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

44.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

45.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

46.     Based on the forgoing, I request that the Court issue the proposed search warrant.

47.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

48.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## REQUEST FOR SEALING

49.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

/s/ Shayne Tongbua
Shayne Tongbua
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on November __9__, 2018


____/s/ Andrea K. Johnstone_____
Andrea K. Johnstone
United States Magistrate Judge

## ATTACHMENT A

### Property to Be Searched

This warrant applies to all information associated with the Facebook user ID 100004922881994, stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

**ATTACHMENT B**

**Particular Items to be Seized**

**I.     Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a) All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b) All activity logs for the account and all other documents showing the user's posts and other Facebook activities from July 24, 2018 to the present;

(c) All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from July 24, 2018 to the present, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d) All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification

1

numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e) All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f) All other records of communications and messages made or received by the user from July 24, 2018 to the present, including all private messages, chat history, video calling history, and pending "Friend" requests;

(g) All "check ins" and other location information;

(h) All IP logs, including all records of the IP addresses that logged into the account;

(i) All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j) All information about the Facebook pages that the account is or was a "fan" of;

(k) All past and present lists of friends created by the account;

(l) All records of Facebook searches performed by the account from July 24, 2018 to the present

(m) All information about the user's access and use of Facebook Marketplace;

(n) The types of service utilized by the user;

(o) The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p) All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q) All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

II. **Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 922(g)(1) and 21 U.S.C. § 841 involving Nathaniel CARR, Quinn POLLOCK, or their associates, since July 24, 2018, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) Records of communications relating to the sale or purchase of illegal drugs and CARR's acquisition and possession of firearms, including but not limited to Facebook messenger conversations from July 24, 2018 to the current date.

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crimes under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crimes under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(e) The identity of the person(s) who communicated with the user ID about matters relating to the sale of illegal drugs, and CARR's acquisition and possession of firearms, including records that help reveal their whereabouts.

(f) Photographs, videos, and posts relating to the sale or purchase of illegal drugs and CARR's acquisition and possession of firearms.